# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND, KRAUSS[1], and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Major ERIC B. SMITH**
**United States Army, Appellant**

ARMY 20120918

Headquarters, I Corps
David L. Conn, Military Judge
William R. Martin, Staff Judge Advocate

For Appellant: Captain Ian M. Guy, JA; William E. Cassara, Esquire (on brief); Captain Michael E. Millios, JA; William E. Cassara, Esquire (Petition for New Trial and reply to answer to Petition for New Trial).

For Appellee: Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major John Choike, JA; Captain Timothy C. Erickson, JA (on brief and answer to Petition for New Trial).

17 July 2015

```
-----------------------------------
MEMORANDUM OPINION
-----------------------------------
```

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

LIND, Senior Judge:

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of wrongful use of cocaine in violation of Article 112a, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 912a (2006).  The panel sentenced appellant to confinement for twenty-four months and forfeiture of all pay and allowances.  The convening authority approved the adjudged sentence, but suspended the execution of any confinement in excess of confinement already served and suspended the execution of any forfeitures, to include adjudged

---

[1] Judge Krauss took final action in this case prior to his departure from the court.

forfeitures, for six months, at which time unless the suspension was sooner vacated, the suspended part of the sentence would be remitted without further action.

This case is before the court for review under Article 66, UMCJ. Appellant raises five assignments of error. Appellant's allegation that he received ineffective assistance of counsel merits discussion and relief. Appellant's remaining assignments of error are without merit. In light of our disposition of appellant's case on appeal, appellant's petition for a new trial filed pursuant to Rule for Court Martial [hereinafter R.C.M.] 1210 is moot.

## FACTS AND PROCEDURAL BACKGROUND

Appellant was a doctor serving in a residency program in Preventive Medicine and Occupational Medicine at Madigan Army Medical Center (MAMC) in 2011. On 22 July 2011, he was randomly selected to submit a urine sample for a unit urinalysis. Appellant was working on rotation away from MAMC and, consequently, did not have to provide a sample. The following week on the morning of 28 July 2011, appellant was notified via email that he was again selected to a unit urinalysis on that date. Appellant was working on rotation approximately 40 to 50 miles away from MAMC. Although appellant was excused from the urinalysis because he was on rotation away from MAMC, he nonetheless drove to MAMC and provided a urine sample.

The Unit Prevention Leader in charge of the 28 July 2011 urinalysis was Sergeant (SGT) JF. The samples were sent to the Forensic Toxicology Drug Testing Laboratory (FTDTL) at Tripler Army Medical Center, Hawaii. The lab tested the samples and advised appellant's unit that appellant's sample was positive for cocaine. Appellant's unit notified him of the positive result on 24 August 2011. Appellant sought a hair follicle test. On 29 August 2011, a sample of appellant's chest hair was collected in Tacoma, Washington. The collector, Ms. JC, initiated a hair and/or urine custody and control form and sent appellant's chest hair sample to Quest Diagnostics (QD), a private drug testing laboratory. On 30 August 2011, QD tested the hair follicle sample and found the sample negative for cocaine metabolites.

Major (MAJ) BG began representing appellant as his detailed defense counsel on or about September 2011.[2] The charge was preferred on 18 November 2011. The

---

[2] Appellant was represented by an additional detailed defense counsel, Captain (CPT) HH, who was detailed to the case one month prior to trial in August 2012. Major BG handled the merits phase of the trial while CPT HH was responsible for the sentencing phase.

Article 32 investigation was held on 19 March 2012 after several delays, primarily at the request of the defense. The charge was referred on 4 April 2012. In the docketing documents, defense counsel requested a trial date of 19 June 2012. The military judge scheduled the trial for 19 June 2012. On 24 May 2012, the convening authority approved appellant's request for Dr. LL, an expert forensic toxicologist consultant. Also on 24 May 2012, the defense moved for a continuance of the trial until on or after 24 September 2012 to accommodate MAJ BG's June 2012 permanent change of station and to give the government time to process the approved expert request for Dr. LL. The military judge granted the defense request for continuance and re-scheduled appellant's trial for 26 September 2012. On 29 August 2012, the I Corps (Rear) (Provisional) Commander withdrew the Charge and transferred it to the Commander, I Corps, who then re-referred the Charge that same day. Appellant was arraigned on the re-referred charges on 26 September 2012.

Major BG moved out of Trial Defense Services as a result of his permanent change of station in June 2012.[3] Although the request for Dr. LL was approved on 24 May 2012, his contract was not finalized until 18 July 2012. Major BG was notified of the finalization of Dr. LL's contract on 8 August 2012. On 6 September 2012 and again 21 September 2012, the defense requested a further continuance until 31 January 2013 to allow defense counsel and Dr. LL the opportunity to travel to the FTDTL to view voluminous discovery available for review at the lab and to accommodate MAJ BG's schedule in his new duty assignment. The military judge denied the defense requests for continuance.[4]

Trial on the merits began on 26 September 2012. The government's case in chief consisted of the testimony of SGT JF, who was in charge of running the 28 July 2011 urinalysis; a stipulation of expected testimony from the urinalysis Observer; testimony from the FTDTL forensic toxicology expert, MAJ DP;[5] and a

---

[3] On or about September 2012, appellant's request for MAJ BG to continue his representation of appellant as Individual Military Counsel was approved. The record of trial reveals MAJ BG represented appellant continuously from September 2011 to February 2013.

[4] There were additional bases for the defense requests for continuance in September 2012 that are not relevant to this discussion. One of appellant's assigned errors is that the military judge abused his discretion by denying these requests for continuance. We conclude the judge did not abuse his discretion.

[5] Over defense objection, the military judge accepted MAJ DP as an expert in the field of forensic toxicology. Appellant alleges the military judge abused his

(continued . . .)

redacted litigation packet of the forensic testing of appellant's urine sample. The government theory of the case was that appellant's urine tested positive for cocaine in a properly conducted and reliable urinalysis test.

Major BG effectively cross-examined SGT JF regarding potential flaws in the urinalysis collection and processing. Major BG also elicited from SGT JF that it is "not plausible" for doctors who are on temporary duty (TDY) and randomly selected for one of MAMC's weekly urinalysis tests to take the test; and that they would take a urinalysis test upon return from TDY. Major BG also vigorously cross-examined MAJ DP as to improprieties in lab testing procedures and protocols and potential contamination of urine samples because of conditions in the lab. Part of the cross-examination of MAJ DP addressed his consideration of appellant's negative hair follicle test result. Before the cross-examination began, MAJ BG advised the military judge that he intended to use the negative hair follicle test to cross-examine MAJ DP about the basis for his opinion pursuant to Military Rule of Evidence [hereinafter Mil. R. Evid.] 703, but he did not intend on introducing the negative hair follicle test result as substantive evidence before the members.[6] The following relevant exchanges occurred between the military judge and MAJ BG:

> DC:   Sir, I'm sure the court is similarly aware of Rule 703 which allows for the testing of the basis of opinion by experts.
>
> MJ:   All right. But doesn't that Rule require that the underlying testing amount to admissible evidence?
>
> DC:   No, Your Honor, it does not.
>
> MJ:   But you agree, without laying the proper foundation, this evidence would be otherwise inadmissible.
>
> DC:   Certainly, your honor.

---

(. . . continued)
discretion in this matter. After review of the record, we conclude the judge did not abuse his discretion.

[6] Defense counsel had the one page negative hair test result from QD marked as Defense Exhibit (Def. Ex.) A for identification.

The military judge allowed MAJ BG to cross-examine MAJ DP to test the basis of his opinion pursuant to Mil. R. Evid. 703 using the results of the hair follicle test, but did not allow admission of the negative hair follicle test result as substantive evidence.[7] Major BG's cross-examination of MAJ DP elicited that: MAJ DP was familiar with hair follicle testing; hair has been used to determine the presence of cocaine in the body; the metabolite for cocaine could remain in a hair follicle from the top of the head for 90-120 days; MAJ DP did not know whether there was a different timeline for chest hair, but the growth for chest hair is different; and that appellant's body hair test result for cocaine metabolite dated 30 August 2011 would be something MAJ DP would consider in evaluating whether cocaine was present in appellant's urine sample approximately 30-40 days prior to the hair follicle test. Major BG's cross-examination of MAJ DP with respect to his consideration of the negative hair follicle test result concluded with the following exchange:

> DC: In preparing your forensic evaluation of this case, did you consider the negative results of hair follicle testing in this case?
>
> . . . .
>
> MAJ DP: Yes.
>
> . . . .
>
> DC: And was that part of your report?
>
> MAJ DP: No.
>
> DC: In preparing your forensic evaluation of this case, did you consider the contradictory findings that that hair follicle test presented?
>
> MAJ DP: Yes
>
> DC: And on the basis of that contradictory hair follicle test, did you conduct further testing of the urine in this case?
>
> MAJ DP: No.

---

[7] The military judge approved eleven questions proffered by MAJ BG to ask MAJ DP regarding the negative hair follicle test.

. . . .

> DC: On the basis of the negative hair follicle test, did you evaluate other factors that might have contributed to contamination of this sample?
>
> MAJ DP: No.
>
> DC: On the basis of the negative hair follicle test, did you seek to consult with the medical reviewing officer in this case?
>
> MAJ DP: No.
>
> DC: On the basis of the contradictory hair follicle test, did you conduct any additional review of the testing procedures as executed in this case?
>
> MAJ DP: No.

On redirect examination, MAJ DP testified that the negative hair follicle test did not change his opinion that appellant's urine properly tested positive for cocaine because:

> The literature and the testing results indicate . . . [h]air testing is very, very useful for detecting a chronic abuser. . . . However, when you do hair follicle testing in a person who abused drugs maybe one time, you would probably not get a positive result on the hair because the level would be so low on the hair follicle test. But you would still see it in the urine test. So, that's not uncommon for a one-time user, for someone to be negative in hair testing and positive for urinalysis testing.

The following exchange next occurred between trial counsel and MAJ DP:

> TC: Did you have a chance to review any reports regarding any hair sample?
>
> MAJ DP: No.
>
> . . . .

TC:  As an expert, . . . would you be able to formulate your opinion as to whether or not there's cocaine in someone's system based on simply a . . . results sheet that says "sweat sample came up negative"?

MAJ DP:  No.

TC:  Why is that?

MAJ DP:  Because I don't know which instrument they were using.  I don't know if it's been calibrated in the morning.  I would like to see them run, you know, positive QC material to make sure the instrument's running properly like--pretty much like what we do with our immunoassay analyzer and our GC-MS.

TC:  Now . . . have you had a chance to review such documents in this particular case with the urine sample?

MAJ DP:  Yes.

On re-cross-examination, MAJ DP testified that a one-time use may or may not show up in hair analysis; that the cocaine enzyme might be found in a hair sample of a one-time user taken 60 days after use; and cocaine might be detected in the one-time user's hair sample, but might not be above the cutoff.

In addition to the cross-examination of government witnesses, the defense case-in-chief consisted entirely of testimony by appellant.  Appellant testified he had been in the Army almost 18 years; he was not required to take the 28 July 2011 urinalysis because he was on rotation that day; he had never used cocaine; he was shocked when advised his urine sample came up positive for cocaine; he would never use cocaine because he had anxiety and panic disorders and his sympathetic nervous system was hyper-stimulated and did not need an extra stimulant; and his health was in decline starting in March 2011 because of multiple gastrointestinal issues.  The following exchange occurred during appellant's direct testimony:

DC:  After you were notified about the positive urinalysis, what did you do?

ACC:  Well, when I gathered my senses, I went and got a hair follicle test.

DC:  And what were the results of that?

7

> ACC:  They were negative.
>
> TC:  Objection, your honor.
>
> MJ:  Sustained.  Members, disregard the last question and answer.

On cross-examination, appellant testified that: he might have been exposed to cocaine in tobacco shops where he purchased cigarettes; there were instances where he acted out on hospital staff; he was counseled for using profanity in the emergency room; and he reprimanded SGT JF at the urinalysis sight two weeks after the 28 July 2011 urinalysis when SGT JF berated doctors for not being "true Soldiers."

On re-direct examination, appellant testified he had his appendix removed on 9 August 2011 and had to return for three laparotomies; he used profanity because he was anxious and felt like he was triaged inappropriately at the emergency room; he was frustrated by MAMC's inability to diagnose his medical issues; and he began to manage his own symptoms with online supplements, taking approximately 30 medications a day.

The government re-called MAJ DP in rebuttal to testify that the substances appellant had ingested should not have resulted in a false positive result for cocaine. On cross-examination, MAJ DP testified that TFDTL does not maintain a database listing substances that may test positive for cocaine, and cocaine positives do not receive medical review officer screening for prescription drugs.

The military judge instructed the members that appellant's hair follicle test could be considered only:

> for the limited purpose of evaluating the basis of the expert's opinion and specifically whether it would have impacted his conclusions regarding whether the person who submitted the urine sample ingested cocaine.  Now, you may use this for that purpose only and for no other purpose whatsoever.  Now specifically you may not consider this information for its tendency, if any, to show whether or not the accused knowingly and wrongfully used cocaine.

The members found appellant guilty of wrongful use of cocaine on 27 September 2012.

In December 2012, appellant hired civilian counsel, Mr. SC, to represent him in submitting post-trial matters pursuant to R.C.M. 1105.  On 25 February 2013,

MAJ BG withdrew from representing appellant citing as good cause appellant's intent to include in his R.C.M. 1105 matters complaints regarding MAJ BG's performance at trial, including MAJ BG's failure to offer the hair follicle test results.

On 30 April 2013, Mr. SC submitted an R.C.M. 1105 package[8] on behalf of appellant containing an affidavit submitted by appellant alleging that:

> I cannot comprehend why [MAJ BG[9]] did not secure the drug litigation packet related to my negative hair follicle test. His inability to do so adversely affected my court-martial and was manifestly unjust. In fact [MAJ BG] has admitted to me on several occasions that he knows that he made a grave error in failing to obtain the hair follicle litigation packet. [MAJ BG] had promised me prior that he would write a clemency letter "owning up" to this fundamental and wholly inexcusable error. He has since broken that promise and now declines to admit his mistakes.

The R.C.M. 1105 matters also include an affidavit by Mr. SC stating:

> I have spoken to [MAJ BG] on several occasions with regard to his willingness to concede he made grave errors as a military defense lawyer during the above-entitled case. Most notably, he admitted to failing to secure the hair follicle test in a timely manner. [MAJ BG] previously agreed to submit a memorandum of record which addressed his legal shortcomings, but later revoked this offer by e-mail transmission.

Submitted with Mr. SC's affidavit are e-mails between Mr. SC and MAJ BG wherein Mr. SC wrote: "Thanks again for agreeing to draft a letter," and MAJ BG responded, "I have reconsidered my agreement to draft the letter we discussed. It will not be forthcoming."

---

[8] Appellant submitted a second R.C.M. 1105 package through his new detailed military defense counsel, CPT BH.

[9] Major BG was subsequently promoted to Lieutenant Colonel (LTC). For purposes of this opinion, we will refer to him as MAJ BG.

Finally, the R.C.M. 1105 matters submitted by Mr. SC also contain a letter from appellant's supervisor, Colonel (COL) SS, stating in relevant part: "In fact on the day of the test in question, I had actually sent an e-mail to the test sergeant notifying him that [appellant] was on a rotation away from the installation and would likely not make it in for testing."[10]

On appeal, appellant argues he received ineffective assistance of counsel because: (1) MAJ BG did not attempt to introduce the hair follicle test or call any witnesses to testify about the test, and (2) MAJ BG failed to call COL SS to corroborate appellant's testimony that he was not required to be at the 28 July 2011 urinalysis.[11]

On 11 April 2014, upon motion of government appellate counsel, we ordered affidavits from MAJ BG and CPT HH addressing the ineffective assistance of counsel issues. Both counsel provided affidavits that are now part of the record. Major BG's affidavit asserts the following relevant facts.

Major BG did not contact QD Labs regarding appellant's hair follicle test because during trial preparation:

> I was focused on the unreliability of the . . . test conducted at [FTDTL], the potential environmental or handling factors that might have led to contamination, the improper conduct of the urinalysis at the time of collection, and most significantly on pursuing alternate means of case disposition for [appellant]. I made the choice to focus on aggressive testing and cross-examination of the Government's case at trial.
>
> . . . .
>
> I did not initially seek to obtain the litigation packet for this hair follicle test because it was originally not my intent to offer it at trial. In deciding how best to present

---

[10] The R.C.M. 1105 matters submitted by Mr. SC also contain a complete copy of the QD litigation package for the negative hair follicle test, lab protocols, and lab employee biographies.

[11] Appellant argues in his brief that there is additional testimony MAJ BG should have elicited from COL SS. We find this additional testimony would not have been admissible at trial.

> this case to a military panel, I made a judgment about how persuasive this hair follicle test might be at trial. Based on my experience, I decided that this test result would not be nearly as significant to the panel as the urinalysis conducted by [FTDTL], and I focused my efforts on pursuing alternate disposition, getting an expert consultant to assist in my attack on the Government's laboratory and its testing, and gathering the necessary discovery to support my tactical goals.

Major BG changed strategy after the military judge denied his 6 September 2012 and 21 September 2012 requests for continuance to visit FTDTL with Dr. LL to gather further discovery.

> When it ultimately became clear that the military judge was not going to allow the Defense sufficient opportunity to prepare the case in accordance with my plan . . . I coordinated with Dr. [LL] to have him seek the litigation packet while I made final trial preparations. The litigation packet was not available to us until after trial. At that point, and prior to [Mr. SC] being retained, I discussed with [appellant] how the hair follicle test result might still be used during his clemency request to the Convening Authority.

During trial, MAJ BG considered "whether there were any alternate means to introduce the hair follicle test results" and concluded the rules of criminal procedure and military rules of evidence allowed only "cross-examination of MAJ [DP] and during direct examination of [appellant], as relevant to his actions near the time of the urinalysis." Major BG "knew neither method would allow introduction of the test result itself, but my strategy was to introduce the existence of the additional test result for the panel to use as they thought appropriate."

With respect to COL SS, MAJ BG's affidavit asserts that he "was aware from my discussions with [appellant's] direct supervisor, that [appellant] was not required to attend the [28 July 2011] urinalysis" and that:

> Based upon my interaction with [COL SS and appellant's direct supervisor], I believed that any benefit to be gained from their corroboration of [appellant's] assertion that he was not required to attend the urinalysis would be greatly outweighed by the potential testimony about [appellant's] character and duty performance. . . . My overall trial strategy was to present a simple picture of an officer

overwhelmed by the tragedy of an unreliable urinalysis and was focused almost entirely on the Government's handling of [appellant's] urine specimen and on cross-examination of the Government's expert forensic toxicologist. Had COL [SS] testified, I expected his testimony to include comments about the hospital staff's concern for [appellant's] erratic behavior, belligerence with staff members, and unprofessional conduct which led COL [SS] to order "Program Level Remediation" (retraining). This is why COL [SS] and [appellant's direct supervisor] were both part of the Government's witness list at trial.[12]

Major BG's affidavit states that prior to his withdrawal as appellant's defense counsel, he and Mr. SC discussed numerous errors and abuses of discretion by the military judge MAJ BG believed occurred during appellant's trial (many of which are raised as assignments of error before this court). With respect to the negative hair follicle test, MAJ BG states in relevant part:

I discussed with Mr. [SC] why I did not enter the hair follicle test into evidence. I had been focused on seeking alternate disposition for [appellant's] case, ways to undercut the significant reliance I expected the panel to place on the urinalysis result, and, most importantly, the employment of my requested expert consultant so that I could make the most sense of the available forensic data. Because I did not have a litigation packet at trial, I knew I could not offer it as evidence, but I used it in my direct examination of [appellant] and extensively in my cross-examination of MAJ [DP]. I also discussed my intent to include it in [appellant's] clemency matters. . . . During that conversation, I volunteered to provide a letter outlining the errors I believed were present in the case and a statement describing my lack of introduction of the hair follicle results.

---

[12] Captain HH, assistant defense counsel, also filed an affidavit where she attached a 20 September 2012 email from MAJ BG to the government requesting "production of [appellant's director supervisor] and COL SS in accordance with the [government] witness list."

SMITH—ARMY 20120918

Major BG's affidavit states he felt it was inappropriate to participate in appellant's post-trial matters after his withdrawal as defense counsel and he so notified Mr. SC via email on 8 April 2013.

Major BG's affidavit makes reference to additional steps he took on behalf of appellant outside of trial to include pressing for an alternate disposition, successfully securing a post-trial deferral of confinement for appellant, and submitting a request for deferral of forfeitures and submission of a post-trial resignation in lieu of court-martial.

**LAW**

The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To prevail on an ineffective assistance of counsel claim, an appellant must demonstrate: (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Id.* at 687. To show deficiency, the errors must have been "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To show prejudice, appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Counsel are presumed to be competent. *United States v. Cronic*, 466 U.S. 648, 658 (1984); *see also Strickland*, 466 U.S. at 689 ("[courts] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."); *Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("even under *de novo* review, the standard for judging counsel's representation is a most deferential one."). Where an appellant "attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012). Consequently, "[w]hile defense counsel would normally be expected to introduce potentially exculpatory evidence, their performance is not deficient when a tactical reason cautions against admission." *United States v. McIntosh*, __ M.J. ___ , slip op. at 4 (C.A.A.F. 8 Jul. 2015).

However, choices may only be considered tactical or strategic after counsel have either fulfilled their duty to make a reasonable investigation, or have made a "reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. As the Supreme Court cautioned: "strategic choices made after

13

thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

## DISCUSSION

We will review separately appellant's allegations of deficiency regarding: (1) MAJ BG's decision not to obtain the litigation packet for the hair follicle test prior to trial, and (2) MAJ BG's decision not to call COL SS as a witness to corroborate appellant's testimony that he was on rotation on 28 July 2011 and did not have to attend the 28 July 2011 urinalysis.

### *Hair Follicle Testing*

Appellant avers MAJ BG's performance was deficient in failing to introduce the negative results of the hair follicle test through the litigation packet with an expert witness from QD laying the foundation. We disagree with appellant's framing of the issue. The appropriate inquiry here is whether MAJ BG's performance was deficient in failing to obtain the litigation packet for the negative hair follicle test in time to evaluate its potential for admission as substantive evidence, and in time to take steps to lay the foundation for admission should the tactical decision been made to admit the negative hair follicle test result as substantive evidence.

We examine whether MAJ BG's actions were reasonable under prevailing professional norms. The facts are not in dispute. Appellant submitted his urine sample on 28 July 2011. The hair follicle test was conducted 30 August 2011, thirty-three days after the urine test. Major BG began representing appellant on or about September 2011. Major BG was aware of the existence of the negative hair follicle test result and its supporting litigation packet for approximately one year before trial and also knew that appellant's intent when taking the hair test was to provide evidence of his innocence. Major BG was also aware that the hair follicle test was conducted within a window of time to provide evidence that appellant was not a chronic user of cocaine and that the test may or may not detect a one-time use of cocaine by appellant on 26-28 July 2011. Major BG did not direct Dr. LL to request the litigation packet for the negative hair test until some point after the military judge denied his 6 and 21 September 2012 requests for continuance. Appellant's trial was held 26-28 September 2012. The litigation packet did not arrive in time to be used at trial, and MAJ BG did not successfully introduce the results of the negative hair follicle test as substantive evidence.

Major BG's explanation is that, prior to the 6 and 21 September 2012 denial of his continuance requests, he did not obtain the litigation packet or speak with

14

anyone at QD because he did not intend to introduce the negative hair test result as substantive evidence. It was not part of his strategy because he believed that the hair test would not be nearly as significant to the members as the urinalysis test. Major BG's defense strategy at the time was to "present a simple picture of an officer overwhelmed by the tragedy of an unreliable urinalysis and was focused almost entirely on cross-examination of the government's forensic toxicologist." His affidavit is unclear as to whether he intended to cross-examine MAJ DP regarding the negative hair follicle test result before his strategy changed when his continuance requests were denied.

We conclude MAJ BG's failure to properly investigate and evaluate the validity, strength, and relevance of the hair follicle test—by at least acquiring the litigation packet and speaking with personnel from QD—was unreasonable under prevailing professional norms. Appellant obtained a negative hair follicle test within a window of time to provide evidence that appellant was not a chronic user of cocaine in support of his innocence. This was exculpatory evidence that, if admitted as substantive evidence, would have enhanced the defense strategy envisioned by MAJ BG. Successful admission of the negative hair follicle test result and its litigation packet would have also strengthened the weight of MAJ BG's cross-examination of MAJ DP when eliciting that MAJ DP did nothing differently when confronted with the negative hair follicle test. Major BG's reliance on experience as the basis for his decision to neglect the hair follicle test evidence is not an adequate explanation under the circumstances of this case. Absent adequate investigation of this testing, MAJ BG was in no position to make any reasonable tactical decision regarding use of the hair follicle test result. We find MAJ BG's failure to investigate the hair follicle testing rises to the level of deficient performance.

The government posits that a review of the litigation packet reveals the chain of custody for the hair originated with appellant. We have reviewed the litigation packet and it appears both appellant and the collection point of contact at ANYLABTESTNOW were present when appellant's hair sample was collected. There is no evidence before us that this was an irregular method of specimen collection. A review of the litigation packet and other documentation from QD reveals nothing on its face that would preclude admission of the negative hair follicle test and litigation packet if properly authenticated and supported by expert testimony. Had MAJ BG obtained the hair follicle test litigation packet, examined it, and spoken to QD lab personnel, he may have found a myriad of valid tactical reasons to avoid admitting the negative hair follicle test results as substantive evidence. Examples could include unreliable collection procedures, insufficient chest-hair length, questionable QD lab procedures or protocols, or a test result that revealed the presence of cocaine metabolites that did not reach the cut-off for a positive result. No such examination of the litigation packet happened in this case.

Even if we were to find MAJ BG's initial strategy to forego investigation of the negative hair follicle test result and focus entirely on attacking the government's case was reasonable, we find MAJ BG's actions after the denial of the 6 and 21 September 2012 defense requests for continuance unreasonable. After the continuances were denied, MAJ BG had changed strategies and decided to try to admit the negative hair test result as substantive evidence and to cross-examine MAJ DP's opinion using the negative hair follicle test result. Having failed to obtain the litigation packet earlier, MAJ BG coordinated with Dr. LL to obtain the litigation packet from QD. However, MAJ BG himself made no contact with anyone from QD and his affidavit has no indication that he instructed Dr. LL to contact QD laboratory personnel to discuss laying the foundation for admission of the negative hair follicle test and litigation packet as substantive evidence at trial. Thus, even if Dr. LL obtained the litigation packet in time to use for trial, the defense had not coordinated with any witnesses to authenticate the litigation packet and lay the foundation for admissibility at trial.

### *Failure to Call Witness to Corroborate Appellant's Factual Testimony*

All affiants again agree on the underlying facts: MAJ BG was aware COL SS could give testimony to corroborate appellant's testimony that he was on rotation and did not have to go to the 28 July 2011 urinalysis; COL SS was both on the government's and defense's witness lists for trial and was therefore available to testify to these facts; and MAJ BG did not call COL SS as a witness to corroborate appellant's testimony that he did not have to be at the 28 July 2011 urinalysis.

We now turn to determine whether MAJ BG's explanation for his decision not to call COL SS was reasonable. Major BG did not call COL SS because he believed "any benefit to be gained by their corroboration of [appellant's] assertion that he was not required to attend the urinalysis would be greatly outweighed by the potential testimony about [appellant's] character and duty performance." Major BG's explanation for failing to call COL SS to corroborate appellant's testimony was not reasonable. If the defense only elicited factual testimony from COL SS that appellant was on rotation on 27-28 July 2011 and that because he was on rotation he was not required to attend the 28 July 2011 urinalysis, the door would not be open for the government to cross-examine the witness about appellant's character and duty performance. Such testimony is beyond the scope of direct examination under Mil. R. Evid. 611(b) and does not place appellant's character and duty performance at issue.[13] For the foregoing reasons, we conclude MAJ BG's failure to call COL SS

---

[13] Mil. R. Evid. 611(b) gives the military judge discretion to permit cross-examination on additional matters as if on direct examination. Any concern by the defense that the military judge might allow the government to cross-examine COL

(continued . . .)

to corroborate appellant's testimony was unreasonable under prevailing professional norms.

We have considered the record as a whole and recognize that MAJ BG zealously represented appellant in seeking an alternate disposition for appellant's case, competently and thoroughly cross-examined SGT JF and MAJ DP regarding urine sample collection and processing irregularities, and proactively represented appellant in the post-trial phase of the trial until his withdrawal as counsel. Nevertheless, with respect to the trial itself for the reasons outlined supra, we find his performance was deficient.[14]

### *Prejudice*

Having found merit to both of appellant's allegations of deficient performance, we must determine whether, absent the errors, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. The record demonstrates a reasonable likelihood that the hair follicle test was admissible and sufficiently reliable to warrant a reasonable defense counsel to obtain it in advance of trial, evaluate it, consider its admission, and if admitted, emphasize its weight on findings and, if necessary, sentencing. A properly authenticated hair follicle test result has been admitted by military courts when supported by expert testimony.[15] In this case, the record reveals MAJ BG tried to introduce the negative hair follicle test as substantive evidence during appellant's

---

(. . . continued)
SS about appellant's character and duty performance as if on direct examination could have been addressed at an Article 39(a) session outside the presence of the members.

[14] Normally, we evaluate the defense team as a whole rather than evaluating the individual shortcomings of any single counsel. *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001). In this case, however, the affidavits from MAJ BG and CPT HH indicate that CPT HH was detailed to appellant's case one month before trial, that she worked under the direction of MAJ BG, and that her role in the case was limited to the sentencing phase of appellant's court-martial. Appellant has not specifically made an allegation of ineffective assistance of counsel against CPT HH and we do not find her performance deficient.

[15] *See generally* Major Keven Jay Kercher, *Time for Another Haircut: A Re-Look at the Use of Hair Sample Testing for Drug Use in the Military*, 188 Mil. L. Rev. 38, 67 n.229 (Summer 2006) (citing cases wherein military courts have allowed hair sample results into evidence).

testimony when he asked appellant the result of his hair follicle test. This question drew a sustained objection from trial counsel and a contemporaneous instruction from the military judge to the members to disregard the question and the answer. Because MAJ BG failed to obtain the litigation packet for the negative hair follicle test in time for trial and failed to contact any expert who would be able to lay the foundation for admission of the hair follicle test result, the defense ensured that the test results would not be considered by the panel as substantive evidence, and the defense was limited to using the test result for cross-examination of MAJ DP's opinion under Mil. R. Evid. 703. The military judge properly instructed the panel that they could not consider the negative hair follicle test "to show whether or not the accused knowingly and wrongfully used cocaine." *See* R.C.M. 703 analysis at A22-52 ("A limiting instruction may be appropriate if the expert while expressing the basis for an opinion states facts or data that are not themselves admissible."); *United States v. Jackson*, ACM 29011, 1992 CMR Lexis 412 (A.F.C.M.R. 10 Apr. 1992). It also precluded the defense from arguing that the negative hair follicle test showed appellant was not a chronic user of cocaine at the time of the positive urinalysis test and that the test created reasonable doubt as to whether appellant used cocaine at all. This evidence would have buttressed the defense theory of the case: why would appellant, a doctor with 17 years of service, who was not a chronic user of cocaine, who knew how short a time cocaine metabolites remained in urine, and who did not have to be at the 28 July 2011 urinalysis attend the urinalysis if he suspected he would come up positive for cocaine?

Major BG's failure to obtain the litigation packet prior to trial also substantially diminished the quality of his cross-examination of MAJ DP in that his cross-examination of MAJ DP was based solely on the one-page negative test result. This allowed trial counsel on re-direct examination to marginalize the effectiveness of the cross-examination by eliciting from MAJ DP that he reviewed no reports regarding any hair sample and that an expert would not base an opinion on a results sheet that a sample came up negative because the expert would not know which instruments were used in conducting the test, whether they were calibrated and running properly, or whether there were quality control measures in place. Major DP then contrasted his review of the one-page results sheet for the negative hair follicle test with the complete redacted litigation packet offered into evidence by the government in support of the positive urinalysis result.

Further MAJ BG's decision not to call COL SS left appellant's testimony— that he was on rotation on 28 July 2011 and not required to attend the urinalysis— uncorroborated. The government contends that the fact that appellant was on rotation and did not have to attend the urinalysis was not a contested issue. We

disagree.[16]  Trial counsel confronted appellant during cross-examination challenging his assertion that he wanted to be at the 28 July 2011 urinalysis.  Trial counsel also challenged appellant's credibility and cross-examined him on erratic behavior he exhibited near the time of the urinalysis.  Corroboration of appellant's testimony that he was on rotation and did not have to attend the urinalysis by a witness in his supervisory chain would have bolstered appellant's credibility.

The government's case relied on appellant's positive urinalysis and evidence elicited on cross-examination of appellant that he was behaving erratically around the time of the urinalysis.  The defense case challenged the urinalysis collection and processing procedures, but also portrayed appellant as someone who had no reason to avoid the 28 July 2011 urinalysis even though he was not required to attend and as someone who was stunned when advised of the positive test result.  We find that had defense counsel properly investigated the hair follicle testing in time for potential use at trial and had called COL SS as a witness to corroborate appellant's testimony, there is a reasonable probability that the result of appellant's trial would have been different.

## CONCLUSION

The findings of guilty and the sentence are set aside.  A rehearing may be ordered by the same or a different convening authority.  The petition for a new trial is denied as moot.  All rights, privileges, and property, of which appellant has been deprived by virtue of the findings and the sentence set aside by this decision, are ordered restored.  *See* UCMJ arts. 58a(b), 58b(c), and 75(a).

Judge KRAUSS and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[16] Sergeant JF testified that doctors on rotation do not have to attend urinalysis until they return from temporary duty, however, SGT JF did not corroborate that appellant was on rotation on 28 July 2011 and did not have to attend the urinalysis.